# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9350 | **DATE** | 9/3/2004 |
| **CASE TITLE** | Baxter vs. Trinity Services, Inc. | | |

**MOTION:**   [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ☒ [Other docket entry]   Defendant's Motion for Summary Judgment [19-1] is granted. See attached.
*Trial date set for 9/28/04 is stricken.*
The clerk shall enter judgment pursuant to Fed. R. Civ. Pro. 58.

*Charles R. Norgle*

(11) ☒ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | SEP 0 8 2004 | date docketed | |
| X | Docketing to mail notices. | | | |
| X | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

Document Number 49

DAISY BAXTER,              )
                            )
        Plaintiff,       )     Case No.: 02 C 9350
                            )
    v.                   )     Honorable Charles R. Norgle
                            )
TRINITY SERVICES, INC.,   )
                            )
        Defendant.    )

DOCKETED SEP 0 8 2004

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge.

Before the court is Defendant Trinity Services, Inc.'s Motion for Summary Judgment.
For the following reasons, Defendant's Motion for Summary Judgment is granted.

## I. BACKGROUND[1]

Plaintiff Daisy Baxter, an African-American female, began her employment with
Defendant Trinity Services ("Trinity") in November 2000. Trinity is a non-profit organization
dedicated to serving individuals with mental retardation and mental illness. Baxter worked as a
Qualified Mental Retardation Professional ("QMRP") for the duration of her employment with
Trinity. As a QMRP, Baxter's duties consisted of, *inter alia*, monitoring the treatment of
Trinity's clients, developing a personal relationship with the clients and their legal guardians, and
coordinating staffing. During her employment with Trinity, Baxter's supervisors were Anthony

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and
notes disputed facts within the text.

Di Vittorio, Director of CILA-East, and Diane Peterson, Associate Director of CILA-East.[2]

Baxter's tenure at Trinity was marked by deficiencies in her job performance, including improper

billing and treatment procedures, failure to attend training sessions, failure to properly fill out

Social Security forms, and her alleged involvement in the falsification of another Trinity

employee's High-School Equivalency Certificate.

After approximately two years, Trinity fired Baxter. Baxter filed suit under Title VII of

the Civil Rights Act of 1964 and 42 U.S.C. § 1981,[3] alleging that Trinity subjected her to a

racially hostile work environment, disparate terms and conditions of employment based on her

race, and that her discharge by Trinity was both discriminatory and retaliatory. Baxter also filed

suit under 42 U.S.C. § 1983, alleging that Trinity, acting as a state actor, violated her civil rights.

In response, Trinity asserts that Baxter alleges no instances of hostility or discrimination that can

be directly attributed to her race, that it had a valid, non-discriminatory reason for discharging

Baxter, and that it is not liable under § 1983, as it is not a state actor.

To support her claims, Baxter first directs the court's attention to the following series of

events. In April 2001, Peterson instructed Baxter to deliver a money allowance to Eric Johnson,

a bipolar client of Trinity, who lived in one of Trinity's group homes. Because the allowance

was a day late, Johnson became upset, and began swearing and punching holes in the wall of his

---

[2] A CILA is a "Community-Integrated Living Arrangement." See http://www.trinity-services.org/prog_serv/cila.htm. These group homes are integrated into local communities, and staffed with counselors who support Trinity's clients. Id.

[3] In the Seventh Circuit, it is settled law that "the methods and order of proof applicable to a claim of disparate treatment under Title VII are equally availing under § 1981." Randle v. LaSalle Telecomm., Inc., 876 F.2d 563, 568 (7th Cir. 1989); see also Ferguson v. Pipefitters Ass'n Local Union 597, 334 F.3d 656, 658 (7th Cir. 2003); Johnson v. City of Fort Wayne, 91 F.3d 922, 940 (7th Cir. 1996). The court will therefore analyze these claims jointly.

room with an ice-pick. Johnson also indicated that he had dreams of killing Baxter. Concerned, Baxter immediately telephoned Peterson and informed her of Johnson's behavior, and recommended that Johnson be hospitalized. Based on her history with Johnson, Peterson decided not to hospitalize him, explaining to Baxter that he would most likely calm down. Johnson did calm down, and remained calm for the rest of the day. Baxter asserts that Peterson's decision not to hospitalize Johnson was based on her race, noting that in an earlier incident in which Johnson became similarly agitated, Peterson accepted the recommendation of a white QMRP to hospitalize Johnson. In that incident, however, Johnson had been depressed for a long period of time, was threatening suicide, and would not "de-escalate."

Two separate incidents occurred during trips to national QMRP conferences. During August 2001, Baxter shared a hotel room with Trinity employees Laura Rodgers and Judith Sokolowski (both white) at a QMRP conference in Nashville, Tennessee. Baxter alleges that Rodgers ordered Baxter to sleep on a cot, while Rodgers and Sokolowski slept on beds, and that Rodgers and Sokolowski used all the counter space in the bathroom, as well as all the towels. In August of 2002, these three women again shared a hotel room, this time at a QMRP conference in Salt Lake City, Utah. Baxter alleges that Rodgers and Sokolowski brought a male QMRP into the hotel room while Baxter was in the shower, intending to embarrass Baxter because of her race. Upon Baxter's request, Rodgers and Sokolowski escorted the male QMRP out of the room.

During September 2001, Trinity was involved in an accreditation process. Every three years, Trinity undergoes accreditation with the Council on Quality and Leadership ("the

3

Council"). Based on its prior experience with this accreditation process,[4] Trinity decided that only its degreed professionals and leadership staff would meet with the Council. Di Vittorio stated that he did not want "those people" to speak with the Council, based on the type of language "those people" used. Baxter asserts that by "those people," Di Vittorio meant blacks. Trinity indicates that Di Vittorio was referring to support staff, and notes that one of the members of Trinity leadership staff was Lois Tate, an African-American. In addition, Baxter alleges that not only was she not given an opportunity to participate in this accreditation process, she never even received training in how to do so. White QMRPs received such training, she asserts. In response, Trinity points out that this accreditation process occurs only once every three years, and that during the time in question, QMRPs were represented by Sokolowski. Sokolowski was then the "lead Q," the most highly experienced QMRP at Trinity. Pl.'s LR 56.1(b)(3) Stmt. of Material Facts, Ex. G Sokolowski dep. at 24-25.

Baxter also directs the court's attention to various other incidents of alleged shoddy treatment by Trinity employees throughout the course of her employment, which she asserts were based on her race. Baxter focuses much of her attention on the manner in which she alleges she was treated by her supervisor, Di Vittorio. Di Vittorio allegedly called Baxter "ignorant" four times during a meeting regarding problems with Baxter's billing procedures. He allegedly told Baxter to stop wearing a hat while other white workers were allowed to wear hats. He asked Baxter whether she could read, called her a liar, and threatened her future in his department. Di Vittorio later sent Baxter a memo apologizing for calling her a liar and threatening her future.

_____

[4] Trinity has received four consecutive awards for Accreditation with Distinction. See http://www.trinity-services.org.

4

Def.'s LR 56.1(a)(3) Stmt. of Material Facts, Ex. E Baxter dep., ex. 20. Di Vittorio allegedly ordered Baxter to perform the low-level task of taking clients to the doctor and dentist more often than other QMRP's. Def.'s LR 56.1(a)(3) Stmt. of Material Facts, Ex, E Baxter dep. at 181-82. Trinity, however, asserts that Baxter volunteered for such duties, and notes that Baxter's willingness to undertake these duties was admirable. Def.'s LR 56.1(a)(3) Stmt. of Material Facts, Ex. G Di Vittorio aff. ¶ 35. Baxter also alleges that Di Vittorio scrutinized her work more closely than other white QMRP's, and yelled obscenities at black workers. Finally, Baxter asserts that her workload was higher than white QMRPs, that she was given lower-level duties than other QMRPs, and that she was denied formal performance reviews that were tied to increases in pay.

Baxter also alleges instances of shoddy treatment by a Trinity nurse, Teresa Viebach, and another Trinity employee, Debbie Stichman. Stichman allegedly scrutinized company loans made to African American employees much more carefully than she scrutinized company loans made to white employees. Trinity, however, asserts that it was their policy to give these loans to any employee who needed one, as long as that employee had not received such a loan in the past ninety days. Stichman also allegedly removed leave paperwork from Baxter's mailbox, and filled it out improperly. Viebach allegedly instructed her niece to be rude to Baxter.

The events leading to Baxter's termination from Trinity began in November 2002. Viebach indicated to Di Vittorio that one of Trinity's employees, Margaret Reeves, seemed to lack basic reading skills. Pl.'s LR 56.1(b)(3) Stmt. of Material Facts, Ex. D Di Vittorio dep. at 67-69. Reeves claimed to hold a GED (a High-School Equivalency Certificate), and Viebach and Di Vittorio expected that someone with a GED would have basic reading skills. Id. Later, as Di

Vittorio was discussing this problem with another Trinity employee, Baxter volunteered that Reeves had obtained her GED "at the same place that I got mine." Id. at 71. Baxter denies saying this. Based on Reeves lack of basic reading skills, and Baxter's alleged statement, Di Vittorio began to investigate the matter. Di Vittorio examined Reeves' and Baxter's GEDs, and determined that they were remarkably similar, based on his observation that the certifying signatures and the GED format were identical. Id. Di Vittorio then referred the matter to Sharon Parker, Director of Employee Services at Trinity, for a fuller investigation.

Baxter, now suspected of helping Reeves falsify her GED, received a letter from Parker, dated December 1, 2002, which officially placed her on leave due to her suspected participation in this scandal. Def.'s LR 56.1(a)(3) Stmt. of Material Facts, Ex. E Baxter dep. at 106-107, ex. 11. The letter also indicated that an investigation was pending, that Baxter had possibly violated Illinois statutory law, and that Baxter was welcome to make a statement or meet with Parker. Id. On the advice of counsel, Baxter chose not to cooperate into Trinity's investigation.

The investigation determined that Reeves' GED, purportedly from Cook County, dated February 22, 2002, did not match the format of a legitimate Cook County GED, dated March 27, 2002, held by another Trinity employee. Reeves' GED did, however, match the format of Baxter's Cook County GED, dated March 10, 1981. The investigation also determined that Reeves' and Baxter's GEDs were virtually identical. See Def.'s LR 56.1(a)(3) Stmt. of Material Facts, 2. The format was the same, the certifying signatures were the same, and the upper state seal was placed identically in both GEDs. Id. The investigation ultimately culminated in an admission by Reeves that she had indeed falsified her GED. Reeves, however, asserts that she did not implicate Baxter in this scheme; in fact, Reeves asserts that she implicated a cousin who

6

formerly worked for the Cook County Board of Education. Pl.'s LR 56.1(b)(3) Stmt. of Material Facts, Ex. C Decl. of Margaret Reeves, ¶¶ 6-7. In addition, Reeves denies Baxter participated in this scheme. Id. at ¶ 8. Based on her cooperation in the investigation, Reeves was given the option of resigning her position with favorable references or being terminated; Reeves chose the former. Parker then sent Baxter a letter, dated December 24, 2002, stating: "Based on the evidence of the investigation the decision has been made to discontinue your employment with Trinity Services effective 12/20/2002." Def.'s LR 56.1(a)(3) Stmt. of Material Facts, Ex. E Baxter dep., ex. 12.

**B. Procedural Framework**

Baxter filed a formal racial discrimination charge with the EEOC on September 16, 2002. The EEOC dismissed, and issued Baxter a "right to sue" letter on September 30 of that year. Baxter then filed a complaint of racial discrimination against Trinity with the United States District Court on December 23, 2002. This complaint was dismissed, but Baxter was given twenty-one days within which to refile a more definite statement. See Minute Order of February 28, 2003. Baxter's "Statement of Clarity" followed. See Pl.'s Stmt. of Clarity. In response, Trinity filed a motion for summary judgment, which is now fully briefed and before the court.

## II. Discussion

**A. Standard for Summary Judgment**

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that

raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); see also Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir. 1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When the defendant moves for summary judgment, the court must view the record and all inferences in a light most favorable to the plaintiff. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the plaintiff's favor must be drawn from specific facts identified in the record that support the plaintiff's position. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 922-23 (7th Cir. 1994). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

**B. Baxter's Claims under Title VII and 42 U.S.C. § 1981**

### 1. Racially Hostile Work Environment

Under Title VII, employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Courts have interpreted this statute to prohibit employers from forcing employees to "work in a discriminatory hostile or abusive environment." Shanoff v. Ill. Dept. of Human Serv., 258 F.3d 696, 701 (7th Cir. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Workplace discrimination in the form of "'intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'" violates Title VII. Harris, 510 U.S. at 21 (citation omitted) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). An employer is liable if either the plaintiff's supervisor created the hostile work environment, Mason v. S. Ill. Univ., 233 F.3d 1036, 1043 (7th Cir. 2000) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)), or a co-worker created the hostile work environment, and the employer was "negligent either in discovering or remedying the harassment." Mason, 233 F.3d at 1043; Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998).

To recover for a hostile work environment, a plaintiff must show that she was: 1) "subject to unwelcome harassment;" 2) that the harassment was based on her race (or "color, religion, sex, or national origin," 42 U.S.C. §2000e-2(a)(1)); 3) that the harassment was severe or pervasive enough to "alter the conditions of the employee's environment and create a hostile or

abusive working environment;" 4) and that "there is a basis for employer liability." Mason, 233

F.3d at 1043. A plaintiff must demonstrate that the workplace was both "subjectively and

objectively offensive." Cerros v. Steel Tech., Inc., 288 F.3d 1040, 1045 (7th Cir. 2002) (quoting

Faragher, 524 U.S. at 787); see also Shanoff, 258 F.3d at 704. Not every instance of rude or

insulting behavior, however, creates a statutory violation. See Cerros, 288 F.3d at 1045-46.

Conduct that is "merely offensive" does not rise to the level of creating a hostile work

environment. Id. at 1046 (citing Harris, 510 U.S. at 22). In determining whether a hostile work

environment exists, courts will consider the frequency of the offensive conduct, its severity,

whether the conduct was threatening or merely offensive, and whether the conduct "unreasonably

interferes with an employee's work performance." Quantock v. Shared Mktg. Serv., Inc., 312

F.3d 899, 904 (7th Cir. 2002); see also Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th

Cir. 1998).

      Baxter's claim that she was subject to a racially hostile workplace fails for two reasons.

First, she cannot show that the conduct she complains of is directly based on her race. See

Shanoff, 258 F.3d at 706 (remarks by plaintiff's supervisor were a clear indication of "direct,

unambiguous hostility to [plaintiff] because of his race and religion . . ."). There is no indication

that Peterson's decision not to hospitalize Eric Johnson was based on Baxter's race, that

Rodgers' and Sokolowski's alleged rudeness to Baxter was based on race, that Trinity's decision

not to allow Baxter to participate in accreditation was based on race, or that any alleged hostility

on the part of Di Vittorio or any other Trinity employee was based on Baxter's race.

      Second, even if Baxter could show that these events were based on her race, these

incidents do not rise to the level of an actionable racially hostile workplace. For Baxter to

prevail on this claim, she must show, *inter alia*, that the conduct she complains of is "severe" or "pervasive." See Faragher, 524 U.S. at 787; Cerros, 288 F.3d at 1045; Mason, 233 F.3d at 1043. By way of example, the court points to two incidents of conduct clearly severe or pervasive enough to establish a legitimately racially hostile working environment. In Cerros, the Hispanic plaintiff was referred to as "'brown boy,' 'spic,' [and] 'wetback.'" Cerros, 288 F.3d at 1042. In addition, "racist graffiti was painted on the bathroom walls. It included racial remarks and symbols such as 'spic,' 'Go Back to Mexico,' 'Tony Cerros is a Spic,' 'KKK,' and 'White Power.'" Id. Finally, the "tires on Cerros' car were slashed." Id. In Ferguson, the African American plaintiff was forced to endure graffiti stating "death to all niggers," "Fuck Niggers," a Ku Klux Klan poster hung in a work trailer, and "the display of a hangman's noose." Ferguson, 334 F.3d at 658. The conduct Baxter complains of are at worst sporadic incidents of insensitivity, and simply do not rise to the required level of severity or pervasiveness.

Since Baxter cannot show that an issue of material fact exists as to whether the conduct she complains of is directly tied to her race, or whether this conduct is sufficiently severe or pervasive, her claim of a racially hostile work environment fails.[5]

---

[5] Trinity asserts that some of Baxter's claims are time-barred. See Def.'s Mem. of Law in Supp. of Its Mot. for Summ. J. at 6-7. Under Title VII, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a claim. Hardin v. S.C. Johnson & Sons, Inc., 167 F.3d 340, 344 (7th Cir. 1999). However, under the "continuing violation doctrine," if any act constituting part of the claim "occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." AMTRAK v. Morgan, 536 U.S. 101, 117 (2002). The court therefore has considered all of Baxter's claims as part of the same allegedly hostile work environment.

11

## 2. Disparate Terms and Conditions of Employment Due to Racial Discrimination

Under Title VII, an employer may not "limit, segregate, or classify his employees . . . in any way which would . . . adversely affect [an employee's] status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). This statute has been interpreted by courts to forbid employers from discriminating in terms of, *inter alia*, "terms and conditions of employment." Hunt v. City of Markham, 219 F.3d 649, 654 (7th Cir. 2000). In order to recover under this statute, a plaintiff must show that she was subject to an "adverse employment action." See id. at 653-54. However, this statute is "not intended to reach every bigoted act or gesture that a worker might encounter in a workplace." Id. at 653 (citing Faragher, 524 U.S. at 787-88; Harris, 510 U.S. at 21). To be successful under this statute, a plaintiff must allege some tangible loss. See Fortier v. Ameritech Mobile Comm., Inc, 161 F.3d 1106, 1111 n.7 (7th Cir. 1998).

Typically, an adverse, or tangible, employment action under this statute will "inflict[] direct economic harm" on the plaintiff. Ellerth, 524 U.S. at 762. Examples of typical adverse employment actions are "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761; see also Crady v. Liberty Nat. Bank and Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993). Some adverse employment actions may not involve direct economic harm, but do involve some loss to the employee, such as "reduc[ing] the employee's career prospects," or creating some sort of "hardship" for the employee. Tart v. Ill. Power Co., 366 F.3d 461, 475 (7th Cir. 2004). For instance, taking an office, telephone, and business cards from an employee is an adverse employment action. Collins v. Illinois, 830 F.2d 692, 704 (7th Cir. 1987). Transferring an

employee to a significantly lower-level position is also an adverse employment action. Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1994). However, "[n]ot everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996). "[A] 'bruised ego' is not enough." Ellerth, 524 U.S. at 761.

In this case, Baxter alleges no adverse employment action. In essence, Baxter alleges only a "bruised ego." Baxter's lack of accreditation training is explainable; accreditation occurs only once every three years, and Trinity was represented by another, more experienced QMRP during this accreditation. See Pl.'s LR 56.1(b)(3) Stmt. of Material Facts, Ex. G Sokolowski dep. at 24-25. In any case, Baxter alleges no economic or other harm from this lack of training. Further, Baxter was not harmed by the decision not to hospitalize Eric Johnson. Baxter also alleges no economic or other tangible loss from any heightened scrutiny or variation in assignments. Finally, Baxter alleges a slew of other trivial matters, none of which constitute a significant adverse change in her employment status. See Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9-10.

Baxter does allege that she was denied formal performance reviews that were tied to increases in pay. Pl.'s LR 56.1(b)(3) Stmt. of Material Facts, Ex. A Baxter aff. ¶ 13. Baxter, however, has failed to develop this argument. See Pl.'s Resp. to Def.'s Mot. for Summ. J. at 10 (outlining this argument in one sentence). The court therefore deems this argument to be waived. See United States v. Jones, 224 F.3d 621, 626 (7th Cir. 2000) ("The lack of development of this argument . . . 'speaks to the paucity of the argument'"); see also United States v. Watson, 189 F.3d 496, 500 (7th Cir. 1999). Moreover, Baxter's allegation does not rise to the level of a tangible employment action. See Ellerth, 524 U.S. at 761 (a "tangible employment action"

constitutes a "*significant change* in employment status. . . ." (emphasis added)).

Since Baxter cannot show that an issue of material fact exists as to whether she was subject to a "tangible employment action," her claim of disparate terms and conditions based on race fails.

### 3. Discriminatory and Retaliatory Discharge

Title VII makes it unlawful for an employer to "discharge any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits employers from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this title, or because he has made a charge . . . under this title." 42 U.S.C. § 2000e-3(a); see also Little v. Ill. Dep't of Revenue, 369 F.3d 1007, 1011 (7th Cir. 2004). In order to succeed on either of these claims, a discharged plaintiff can prove her employer's discriminatory intent by direct or indirect evidence. Id.; see also Bahl v. Royal Indem. Co., 115 F.3d 1283, 1290 (7th Cir. 1997).

Direct evidence of discriminatory intent is evidence that shows the employer's intent without the need to rely on "inference or presumption." Bahl, 115 F.3d at 1290 n.6. Direct evidence is evidence that "speak[s] directly to the issue of discriminatory intent, [and] also relate[s] to the specific employment decision in question." Oates v. Discovery Zone, 116 F.3d 1161, 1170 (7th Cir. 1997). It is likely the case that the only real direct evidence of discriminatory intent is an admission by the employer. Logan v. Kautex Textron N. Am., 259 F.3d 635, 638 (7th Cir. 2001); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994).

To proceed by means of by indirect evidence, a plaintiff must use the familiar McDonnell Douglass burden-shifting method. See McDonnell Douglass Corp. v. Green, 411 U.S. 792, 802-

14

04 (1973). Under this method, a plaintiff must first establish a prima facie case. A prima facie case of discrimination must show: 1) that the plaintiff was "within a protected class;" 2) that the plaintiff "was performing to the employer's legitimate expectations;" 3) that she "suffered an adverse employment action;" and 4) that the employer "treated similarly situated employees of a different race more favorably." Kautex, 259 F.3d at 639; see also Little, 369 F.3d at 1011. Likewise, a prima facie case of retaliation must show: 1) that the plaintiff "engaged in statutorily protected expression;" 2) that she "suffered an adverse employment action;" and 3) that there is a "causal link between the two." Kautex, 259 F.3d at 640; see also Bell v. EPA, 232 F.3d 546, 554 (7th Cir. 2000). If the plaintiff presents a prima facie case, there is a presumption of discrimination or retaliation, and the burden shifts to the employer to show a "legitimate, nondiscriminatory reason" for the firing. Stockett v. Muncie Ind. Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000); see also Little, 369 F.3d at 1011. If the employer can show a legitimate reason for the firing, the burden shifts back to the plaintiff to show that the proffered reason was pretextual. Stockett, 221 F.3d at 1001; see also Gordon v. United Airlines, Inc., 246 F.3d 878, 886 (7th Cir. 2001).

Baxter has presented no direct evidence (an admission by Trinity) of either discriminatory or retaliatory firing. She must therefore use the burden shifting method. To establish a prima facie case of discriminatory discharge, Baxter must first show that she is a member of a protected class. Little, 369 F.3d at 1011. It is undisputed that Baxter is African American. Baxter must next show that she was performing her job satisfactorily. Id. It is not clear that Baxter can make this showing. Baxter improperly billed for client services, causing another Trinity employee's billings to be deleted. She received a memo from Di Vittorio outlining deficiencies in her job

15

performance, including problems with her billing and treatment procedures. Def.'s LR 56.1(a)(3) Stmt. of Material Facts, Ex. E Baxter dep., ex. 15. She failed to attend training sessions during a work trip, and a team-building dinner after the trip was completed. She improperly filled out Social Security forms because she failed to read the instructions. Baxter must also show an adverse employment action. Little, 369 F.3d at 1011. It is undisputed that Baxter was fired. Finally, Baxter must show that a similarly situated employee of a different race was treated more favorably. Id. Baxter argues that Reeves, who was also implicated in the GED scandal, was treated more favorably than Baxter, as Reeves was allowed to resign with favorable references, and other Caucasian employees were not placed on leave. Pl.'s Resp. to Def.'s Mot. for Summ. J., at 8-9. However, this part of Baxter's prima facie case fails, as Reeves is, like Baxter, African American, and no other employee was implicated in this scandal. Because Baxter cannot show that she was performing her job satisfactorily, or that a similarly situated employee of a different race was treated more favorably, Baxter has not successfully made out her prima facie case of discriminatory discharge.

To establish a prima facie case for retaliatory discharge, Baxter must first show that she engaged in some form of expression protected by Title VII. Kautex, 259 F.3d at 640. It is undisputed that Baxter filed charges of racial discrimination with the EEOC and the federal district court. These are protected activities under Title VII. See 42 U.S.C. § 2000e-3(a). Baxter must also show that she suffered an adverse employment action. Kautex, 259 F.3d at 640. It is undisputed that Baxter was discharged. Finally, Baxter must show a causal relation between her protected activity and her discharge. Id. Trinity's clearly stated reason for Baxter's discharge, however, is Baxter's participation in the GED scandal. Rather than attempt to refute Trinity's

16

stated reason for her discharge, Baxter presents only conclusory allegations of racial animus in response. Baxter thus fails to show a causal relation between her protected activity and her discharge. See Stone v. City of Indianapolis Pub. Util.Div., 281 F.3d 640, 644 (7th Cir. 2002) ("If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment"). Baxter has thus not successfully made out her prima facie case of retaliatory discharge.

Even though Baxter has not established a prima facie case of discriminatory or retaliatory discharge, the court, with an abundance of caution, will complete the burden-shifting analysis. Assuming that Baxter has made out a prima facie case of discriminatory and discriminatory discharge, the burden shifts to Trinity to show a "legitimate, non-discriminatory reason" for her termination. See Stockett, 221 F.3d at 1001. To meet this burden, Trinity must "only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision was not motivated by discriminatory animus." Id. (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981)). Trinity has met this burden by presenting evidence that it fired Baxter because she helped Reeves procure a fraudulent GED. Thus the burden shifts back to Baxter to show that this purported reason for her firing is pretextual. See Stockett, 221 F.3d at 1001.

In order to establish that an employer's stated reasons for terminating an employee are pretextual, "a plaintiff must show more than that the employer's decision was incorrect; the plaintiff must also show that the employer lied about its proffered explanation." Johnson v. Nordstrom, Inc., 260 F.3d 727, 732 (7th Cir. 2001). The plaintiff must either show direct evidence that the reason given for the termination was a lie, or prove pretext indirectly by

17

showing one of the following: "(1) Defendant's explanation of Plaintiff's discharge had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) . . . the reason stated was insufficient to warrant the [termination]." Id.; see also Bahl, 115 F.3d at 1291; Lenoir v. Roll Coaster, Inc., 13 F.3d 1130, 1133 (7th Cir. 1994).

Baxter has presented no direct evidence that Trinity's stated reason for her termination was pretext, or a lie. Baxter merely alleges that Trinity never offered a clear reason for firing her, that Di Vittorio wanted Baxter fired, that the timing of the events is suspect, and that Reeves was treated differently than Baxter. Pl.'s Resp. to Def's. Mot. for Summ. J., at 2-8. Even if these allegations were true, these events would not be direct evidence that Trinity is lying about its reasons for terminating Baxter. See Bahl, 115 F.3d at 1290 n.6 (direct evidence proves a fact without the need for "inference or presumption").

Since Baxter has presented no direct evidence of pretext, she must establish pretext by making one of the three above showings. This Baxter cannot do. First, Trinity's explanation for firing Baxter clearly has a basis in fact. Reeves admitted her GED was false, and Baxter's and Reeves' GEDs were nearly identical. Second, Baxter not shown that the GED scandal was not the "real" reason she was fired. At most, Baxter has shown that Trinity conducted an imperfect investigation into the matter. This does not show that Trinity's explanation for Baxter's firing was pretextual. See Logan v. Caterpillar, Inc., 246 F.3d 912, 921 (7th Cir. 2001). In Caterpillar, the plaintiff was fired after Caterpillar conducted an arguably imperfect investigation into whether the plaintiff had violated company rules, and committed crimes. Id. at 920-21. In response to Logan's claim that the stated reasons for his termination were pretextual, the Seventh Circuit indicated that "our task is not to second guess Caterpillar's investigative process, but only

18

to decide whether he was discharged for a discriminatory reason." Id. at 921. In this case, the court similarly refuses to inquire into the efficacy of Trinity's investigation. It is Baxter's burden to show that the GED scandal was not the "real" reason for her termination, and she has not done this. Finally, there is no indication that falsifying a co-worker's GED is insufficient grounds for dismissal.

Since Baxter cannot show that an issue of material fact exists as to whether she was subject to discriminatory or retaliatory discharge, these claims fail.

## C. Baxter's Claim under 42 U.S.C. § 1983

Section 1983 is intended to "deter state actors, and private individuals in collaboration with state officials, from using a 'badge of authority' to deprive individuals of rights guaranteed by the Constitution." Fries v. Helsper, 146 F.3d 452, 457 (7th Cir. 1998). In order to establish a cause of action under § 1983, a plaintiff must show that she was deprived of a Constitutional right (or a right guaranteed by other federal law), and that this deprivation resulted from "the defendant(s) acting under color of law." Id. "Under color of law" means the same thing as "state action." Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001); Thomas v. Pearl, 998 F.2d 447, 448 (7th Cir. 1993).

Baxter argues that Trinity's acceptance of state funding makes it a state actor. See Pl's. Resp. to Def.'s Mot. for Summ. J. at 13. However, the mere receipt of state funds does not make a private entity a state actor. Murphy v. Morgan, 855 F. Supp. 943, 948 (N.D. Ill. 1994) (citing Blum v. Yaretsky, 457 U.S. 991, 1011 (1982)); see also Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982). Trinity's mere receipt of state funds, without more, thus does not make Trinity a state actor. Therefore Baxter's §1983 claim fails.

19

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

ENTER:

_Charles R. Norgle_

CHARLES RONALD NORGLE, Judge

United States District Court

DATED: _9-3-04_